472 A.2d 505

# WASHINGTON SUBURBAN SANITARY COMMISSION

v.

## SOUTHERN MANAGEMENT CORPORATION.

No. 1069, Sept. Term, 1983.

Court of Special Appeals of Maryland.

March 13, 1984.

Certiorari Denied July 13, 1984.

Harry L. Durity, Upper Marlboro, for appellant.

Ronald Willoner, College Park, with whom were Willoner, Calabrese & Rosen, P.A., College Park, on the brief, for appellee.

Argued before WILNER, ADKINS and ALPERT, JJ.

ALPERT, Judge.

This case is about water. Lots of water. In fact no one knows how much water. The consumer wants to pay for the water it consumed. The supplier wants to be paid for the water it supplied. A judge decided that the consumer did not have to pay. The judge was right. We explain.

### Background

The Washington Suburban Sanitary Commission (WSSC) was created in 1918 for the purpose of providing, *inter alia,* for the construction, maintenance, and operation of a water supply system in Montgomery and Prince George's Counties. 1918 Md.Laws ch. 122. To generate funds, the WSSC was empowered to collect service rates for all properties connect-

ed with a water pipe under its ownership. *Id.* at § 13. These service rates were to be based upon

> the amount of water passing the meter during the period between the last two readings, said meter being required to be placed on each water connection by, and at the sole expense of, the Commission.

*Id.* This method of determining rates for water service continued until 1965 when the General Assembly authorized the WSSC to adopt an estimated billing procedure. 1965 Md.Laws ch. 785. This provision is embodied today in Md. Ann.Code, art. 29, § 6–104(b)(3) (1957, 1983 Repl.Vol.):

> The WSSC may provide for the billing and collection of the water and sewer usage charges on an estimated basis for periods of 6 months or less, but in that case the WSSC shall require that the meters be read every 6 months, and that the final bill for the 6 month period shall be based on the actual consumption adjusted by the previous estimates.

The apparent purpose of sanctioning estimated bills is to permit the WSSC to charge for water usage without reading the water meters with the limitation that bills be adjusted every six months to reflect actual water use based on a meter reading.

It is the WSSC's failure to comply with § 6–104(b)(3) which gives rise to this appeal.

### Facts and Procedural History

Southern Management Corporation, Inc. ("Southern") is engaged in the business of managing and operating apartment projects located throughout the Washington metropolitan area. Between March 1981 and March 1982 the WSSC provided water service to Southern's apartment complexes known as Glendale Lakes in Lanham, Summit Hills in Silver Spring, and Steward Manor in Laurel. During this timeframe the WSSC periodically furnished Southern with water bills based on the historical average daily consumption of

water and not on the actual consumption by the apartment units.

Between March 1981 and March 1982 Southern endeavored to reduce its water bills and expended in excess of $150,000 to lessen the actual consumption at Glendale Lakes and Summit Hills. In view of these conservation efforts, Southern considered the WSSC's estimated bills to be too high. Southern refused to pay the estimated bills and requested bills based on actual readings of the complexes' water meters. The WSSC informed Southern that water service would be terminated unless the estimated bills were promptly paid.

Thereafter, Southern paid WSSC $187,190.79 under protest and initiated suit in the Circuit Court for Prince George's County[1] alleging that WSSC had breached its statutory duty under Md.Ann.Code, art. 29, § 6–104(b)(3) to adjust Southern's estimated water bills to reflect the actual consumption of water. Southern sought recovery of the $187,190.79 paid under protest and filed a motion for summary judgment. Southern supported its motion with letters received from Agnes M. Thornburg, Account Service Head in WSSC's Customer Service Division, and William C. Austin, Jr., WSSC's Customer Service Division Manager. These letters explained that actual readings could not be provided as the water meters were either not in line or inoperable for varying periods of time at Glendale Lakes and Summit Hills.

The matter came on for hearing on January 7, 1983 before Judge Albert T. Blackwell, Jr. Southern argued it was entitled to summary judgment because there was no genuine factual dispute due to WSSC's admission that it failed to provide meter readings demonstrating actual water consumption. WSSC responded that its estimates were correct and that a factual dispute existed since Southern claimed it

---

1. Where a consumer has a bona fide billing complaint with a public utility, the proper recourse is payment of the amount demanded under protest and suing for its recovery. *Sims v. Alabama Water Co.*, 205 Ala. 378, 87 So. 688, 689–90 (1920).

did not use a certain amount of water while WSSC insisted Southern did. Judge Blackwell read § 6–104(b)(3) as providing Southern with the right to receive actual readings of its meters. The motions judge, however, denied Southern's motion at that time to provide WSSC the opportunity to proffer expert testimony which would reflect the actual water consumption during the subject period.

The parties then deposed WSSC employees Thornburg and Austin. Thornburg explained WSSC's policy of estimating bills when meters were broken or by-passed due to water pipe construction. She related that the Summit Hill water meter had been by-passed due to a relining project and that water service had been temporarily provided from a nearby fire hydrant. Although fire hydrant meters exist, Thornburg testified that such meters were not used at Summit Hills because the particular hydrant also serviced other WSSC customers. She further stated that, to her knowledge, there was no way to determine actual water consumption during a period of time where a water meter was not in operation. Thornburg asserted that estimated billing was used even where meters were operating if the meter's consumption reading did not conform to historical usage. Austin admitted on thirteen occasions that he could not determine the actual volume of water used at Summit Hills and Glendale Lakes.

Southern filed a second motion for summary judgment and arguments were heard on May 13, 1983. WSSC conceded that there was no metering of Southern's water and that it was unable to supply a bill reflecting actual consumption. Judge Blackwell noted that in answering interrogatories posed by Southern, WSSC admitted that the water bill was estimated "using the historical usage as a basis because of the water main relining project and the fact that the meter did not register properly when the main was placed back in service. . . ." Judge Blackwell opined:

I am of the opinion [§ 6–104(b)(3)] means what it says, and it means that a person or corporation or business is only responsible for actual metered water usage, ultimate-

ly. They may be responsible for estimated readings be-
tween billings, but some point along the line they are
entitled to actual water meter readings, not an estimated
bill. Because an estimated bill obviously to all of us could
be grossly wrong. People could turn off their water and
go to Florida for three months and use none, and if you
come back and the meter is not in working order and they
have been billed for an estimated bill during that period of
time it can be adjusted. If there is no meter there we
don't know whether they have ever used it or not and it
would be an inequity, unjust equity to charge them for the
water use.

\*    \*    \*    \*    \*    \*

While I recognize inequities and you supplied a lot of
water, you should be paid for it, for some of it, unless you
complied with your own, in effect, statutory provisions, I
don't think you are entitled to the money in this case.

Because WSSC admittedly could not provide accurate me-
tered bills as required by § 6–104(b)(3), the court held that
no genuine factual dispute existed and granted summary
judgment in favor of Southern.

On appeal, WSSC contends that Judge Blackwell miscon-
strued § 6–104(b)(3) and that summary judgment was inap-
propriately granted. We disagree and shall affirm.

### The Statute

The WSSC urges us to hold that § 6–104(b)(3) is ambigu-
ously worded and in need of further explanation since the
subject statute does not contemplate the appropriate billing
method where a water meter is inoperable. The WSSC
posits that

The Legislature, in its wisdom, could not have contemplat-
ed that water and sewer services, as necessary and expen-
sive as they have become, should ever be consumed or used
without anticipating payment for properly estimated
charges.

■ We categorically reject these arguments. Admittedly, there are occasions where a statute's language is opaque and the legislature's intent difficult to discern. This simply is not the case here.

Section 6–104(b)(3) provides:

The WSSC may provide for the billing and collection of the water and sewer usage charges on an estimated basis for periods of 6 months or less, but in that case the WSSC *shall* require that the meters be read every 6 months, and that the final bill for the 6 month period *shall* be based on the actual consumption adjusted by the previous estimates.

(emphasis supplied). Where there is no ambiguity in a statute's language, there is no need to apply rules of statutory construction to determine the legislature's intent. *District Land Corp. v. Washington Suburban Sanitary Corp.,* 266 Md. 301, 307, 292 A.2d 695 (1972). Accordingly, we shall limit our discussion of § 6–104(b)(3) to the narrow question of whether the provision is mandatory or directory.

■ We cannot ignore the legislature's use of the word "shall" when deciding this issue. Whether the word "shall" is mandatory or directory depends upon the legislature's intentions as determined "from the nature of the subject matter and the purpose to be accomplished." *Resetar v. State Bd. of Educ.,* 284 Md. 537, 547, 399 A.2d 225 (1979). As articulated in our Background, since 1918 the General Assembly has enunciated the requirement that the WSSC may charge its customers only for the actual water consumed as indicated by water meter readings. Even when the legislature countenanced estimated bills in 1965, it stipulated that the charges "shall" be adjusted each six months to reflect actual usage. Our historical review manifests that the purpose to be accomplished by § 6–104(b)(3) is the fair, just and *accurate* billing of WSSC customers. In view of this purpose, we hold that the billing scheme outlined in § 6–104(b)(3) is mandatory and must be complied with by the WSSC.

Moreover, we reject WSSC's assertion that this statute does not contemplate the precise factual situation presented in this case. Since 1965 the General Assembly has provided the WSSC with a six month period of time to adequately ensure that its method of measuring service rates through water meters is operable. In instances where the WSSC cannot demonstrate actual consumption because of malfunctioning meters, the legislature has directed that it cannot collect on the basis of estimated bills. We view this consequence to be the General Assembly's method of assuring that the WSSC properly maintains its equipment and that the WSSC renders accurate bills for water actually consumed by residents of Montgomery and Prince George's Counties.

Other jurisdictions with provisions similar to § 6–104(b)(3) have reached the same conclusion. The case of *People ex. rel Lind v. City of New York,* 63 Misc. 511, 117 N.Y.S. 1068 (N.Y.Sup.Ct.1909), contains strikingly familiar facts. There, the owner of a Manhattan apartment building questioned the water rates assessed against the building during a period of time when the water meter was out of order. The meter was repaired and a bill for the unmetered water issued on the basis of average daily usage after the meter had been rectified. During the subject time period New York law mandated that "the charge for water shall be determined only by the quantity of water actually used as shown" by water meters. As the estimated bills were not based on actual consumption, the court held that the estimated bills did not have to be paid.

Another factually analogous case is *Lehigh Valley R. Co. v. Mayor and Alderman of Jersey City,* 103 N.J.L. 574, 138 A. 467 (N.J.Super.1927), *aff'd,* 104 N.J.L. 437, 140 A. 920 (N.J.1928). In 1908, the city installed a water meter which, pursuant to a contract between the parties, formed the basis for determining the railroad's water bill. Fourteen years later, testing indicated that the meter was malfunctioning and registering only a percentage of the water actually used. Based on test findings, the city rendered an estimated

bill of $124,438.88 to reflect the deficiency during the entire fourteen year period. Upon the railroad's refusal to pay, the bill was forwarded to the city collector who notified the railroad that the city intended to sell the railroad's property to resolve its water bill debts. The railroad sought an injunction to prevent the sale claiming that the billing methods were inaccurate. The injunction was denied and certiorari granted. On appeal, the railroad renewed its argument that the bill was based on tests which were "unsound," "unreliable," "insufficient," "incomplete," and "fallacious." The Superior (then Supreme) Court of New Jersey set aside the water bill because the city failed to produce sufficient evidence to justify the amount charged.

> There is nothing . . . showing with any certainty when that condition of disrepair or inaccuracy arose. It would therefore be highly arbitrary to assume that it had existed a month or a year prior to the test, and certainly much more unwarranted to carry it back to the date of installation in 1908, as the city has.

> Disregarding the question of disrepair and assuming that the meter could not and never did register when the flow was small—under 300 or 400 gallons per minute—and assuming that the test was accurately made and the testing apparatus was accurate, the result arrived at by the method employed by the city would still bear the stamp not only of inaccuracy, but of conjecture and speculation.

> By the method of computation employed, accuracy in result could be reached only provided that during all times in the period from 1908 the several flows through the meter had been in accurate accord with the flows as measured during the test period. This is not shown, and, of course, could not be because such a condition did not and could not exist.

*Id.* 138 A. at 468–69. *Accord Armour & Co. v. Mayor and Alderman of Jersey City,* 5 N.J.Misc. 813, 138 A. 469 (N.J.Super.1927), *aff'd,* 104 N.J.L. 432, 140 A. 918 (N.J.1928).

*Summary Judgment*

We have explained that § 6–104(b)(3) is a mandatory provision. Thus, unless WSSC could show the actual consumption by Southern's apartments, it could not collect the estimated amount billed. WSSC admitted in answers, depositions and interrogatories that it was unable to supply actual meter readings demonstrating actual consumption. As this factual matter was not disputed by Southern and because § 6–104(b)(3) is mandatory, Southern was entitled to judgment as a matter of law. Maryland Rule 610.

JUDGMENT AFFIRMED; WASHINGTON SUBURBAN SANITARY COMMISSION TO PAY THE COSTS.