**CONCRETE GENERAL, INC., Plaintiff,**

v.

**WASHINGTON SUBURBAN SANITARY COMMISSION, and Commissioners Robert P. Will, Ada Koonce Blumenschein, Henry T. Arrington, Waymond D. Bray, Gilbert B. Lessenco, and Robert M. Potter, Defendants.**

Civ. A. No. MJG–88–1356.

United States District Court,
D. Maryland.

Nov. 25, 1991.

Scott A. Livingston, Andrew N. Cook, Dempsey, Bastianelli, Brown & Touhey, Chartered, Washington, D.C., for plaintiff.

Bernadette Gartrell, and Koteles Alexander, Gartrell, Alexander & Gebhardt, Silver Spring, Md., for defendants.

## MEMORANDUM AND ORDER

GARBIS, District Judge.

The Court has before it the parties' cross-motions for summary judgment, as well as memoranda and affidavits filed in connection with their motions. The Court has also had the benefit of oral argument with respect to these motions.

Plaintiff Concrete General, Inc., a Maryland corporation engaged in the business of highway construction, brings this action to challenge the constitutionality of the Minority Procurement Policy ("MPP"), adopted by the Washington Suburban Sanitary Commission with regard to procurement contracts. Concrete General contends that the policy, which is designed to encourage the participation of minority business enterprises ("MBEs") in bidding for procurement contracts, violates the Equal Protection Clause of the Constitution.

## I. FACTUAL BACKGROUND

The Washington Suburban Sanitary Commission ("WSSC") is a state administrative agency designed to regulate the construction, maintenance and operation of the water supply, sewer and drainage. systems for the Washington Suburban Sanitary District, located in Prince George's and Montgomery County, Maryland. In 1978, WSSC adopted a legislative resolution, Resolution 78–504, pledging to encourage and promote increased participation of minority-owned businesses in the letting of procurement contracts. WSSC adopted the resolution after engaging in a fact-finding mission to determine the level of participation by minority-owned businesses in WSSC programs, from which WSSC concluded that few contracts were awarded to minority-owned businesses. In February of 1985, after collecting additional data on the issue, WSSC developed and adopted the Minority Procurement Policy, for the purpose of increasing the participation of minority-owned firms in the bidding process for procurement contracts. The MPP sets the goal of awarding to minority-owned firms at least 25% of the total dollar value of all procurement contracts awarded each year. Minority Procurement Policy, Section 4–4 of the WSSC Basic Purchasing Policies, § C(1)(b).

To achieve that goal, the MPP, as revised in 1987, sets forth six different procedures by which WSSC can encourage increased minority-owned business participation in the procurement of goods and services contracts. The MPP gives the WSSC Purchasing Agent discretion to use one or more of the following practices: The Agent can (1) require contracts which include subcontractors to subcontract out at least 10% of the contract's total value to minority subcontractors; (2) require that a procurement contract be awarded to a minority-owned firm submitting a bid within 10% of the lowest bid; (3) require or recommend that competitive bidding of procurement contracts be restricted to minority-owned

firms, (hereinafter the "restricted bidding" provision); (4) require or recommend that procurement contracts be directly negotiated with one or more minority-owned firms; (5) waive or reduce all or part of the Commission's bonding and/or insurance requirements for minority-owned firms (if the Purchasing Agent judges that the requirements would deny the minority-owned firm an opportunity to perform the contract which the firm has shown itself otherwise capable of performing); (6) recommend waiver of a bid's or proposal's corporate experience requirement for a minority-owned firm if the firm has at least one year's relevant corporate experience and the firm's principals have corporate experience. MPP § C(1)(b)(1–6).

The MPP also requires that the Purchasing Agent consider the following criteria in selecting one or more of the procedures prior to awarding the contract under the program: whether the selected procedure is (1) likely to increase the number of minority-owned firms responding to procurement requirements in the future; (2) likely to increase the dollar value of procurement awards to minority-owned firms in the future; (3) likely to further the Commission's goals under the MPP without unnecessarily interfering with the efficient operation of the Commission; (4) the most effective alternative available which will further the Commission's goals under the program. MPP § C(1)(c)1–4.

The Policy defines a minority-owned business to be an entity at least 51% owned and controlled by one or more members of a minority group, to include Blacks, Hispanics, American Indians, Alaskan Natives, Asian or Pacific Islanders, females or the physically or mentally disabled. MPP § C(6)(a)(1), (2). The MPP does not limit eligible minority-owned contractors to those from Prince George's and Montgomery counties, and in fact has no geographical limitation whatsoever. The MPP also has no expiration date, but instead requires that WSSC annually review the program to determine what changes, if any, are necessary to improve the effectiveness of the program. MPP § C(8)(d).

At the time the MPP was enacted in 1985 to apply to procurement contracts, roadway paving contracts had only recently been added to WSSC's Procurement Department. Prior to 1984, road paving contracts had been handled by WSSC's Engineering Department, and had been classified as "construction" contracts. Under Md.Ann. Code art. 29, § 3–102 (1983), which governed the letting of government construction contracts prior to 1984, WSSC was required to bid all construction contracts including paving contracts competitively and to award the contract to the lowest bidder. In 1984, a year before the adoption of the MPP, WSSC reclassified roadway paving contracts as procurement contracts, shifting the contracts from the Engineering Department to the Procurement Department. During that same year, the Maryland General Assembly amended § 3–102 to create the Mandatory Minority Business Utilization Program ("MMBUP"), which was designed to encourage minority participation in the competitive bidding of construction contracts. Because paving contracts were no longer "construction contracts," they were not subject to the new MMBUP regulations. However, in 1985, WSSC adopted the MPP to apply to procurement contracts, including the newly classified roadway paving contracts.

In January of 1988, the Procurement Department of WSSC invited bids on two roadway paving contracts, hereinafter referred to as Contract A and Contract B. Bids for Contract A were solicited with the understanding that WSSC could choose to award the contract to an MBE that had submitted a bid within 10% of the lowest bid, pursuant to § C(1)(b)(2) of the MPP. The WSSC Purchasing Agent chose to restrict bidding for Contract B to qualified MBEs, pursuant to MPP § C(1)(b)(3)—the restricted bidding provision. Plaintiff Concrete General submitted the lowest bid on both paving contracts. The senior buyer of the Procurement Department recommended awarding Contract A to Prince George's Contractors, a minority-owned business, because that firm had bid within 10% of Concrete General's price. However, the WSSC Purchasing Agent did not agree

with the recommendation. Ultimately, the head of the Department of Maintenance and Operations decided not to apply the 10% price preference, and WSSC awarded Contract A to the lowest bidder, Concrete General. However, WSSC awarded Contract B to the lowest bidding MBE, Prince George's Contractors, despite the filing of a bid protest by Concrete General to challenge the decision to restrict bids exclusively to MBEs.

Concrete General filed suit in this court, challenging the Department's exercise of the restricted bidding provision to bar Concrete General from submitting a bid on Contract B,[1] on two grounds. First, Concrete General contends that in enacting the MPP without express authorization from the legislature, WSSC exceeded the legislative authority granted to it as an administrative agency by the Maryland General Assembly. Second, Concrete General contends that under the strict scrutiny standard applied to state-created programs that draw classifications based on race, the MPP is unconstitutional because it advances no compelling state interest, and is not narrowly tailored to achieve the state's asserted interest. Both parties now bring motions for summary judgment.

## II. STANDARD OF REVIEW

In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court addressed in detail the analysis a court should use in considering a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.[2]

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Id.* at 322–23, 106 S.Ct. at 2552. Although the moving party bears the initial burden of informing the district court of the basis for its motion, by identifying the materials which demonstrate the absence of a genuine issue of material fact, the moving party need not negate the adverse party's claim. *Id.* at 323, 106 S.Ct. at 2553. The motion should be granted so long as the materials before the district court demonstrate that the standard set forth in Rule 56 is satisfied. *Id.*

In evaluating whether a dispute about a material fact is "genuine," the court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511. This standard "mirrors" the standard for a directed verdict under Fed.R.Civ.P. 50(a), which provides that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Id.* at 250, 106 S.Ct. at 2511; Fed.R.Civ.P. 50(a). In an ordinary civil case, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512.

On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106

---

1. Given that Concrete General's sole injury is the rejection of its low bid for Contract B, Concrete General has standing only to challenge the MPP restricted bidding provision, and not other portions of the MPP.

2. Summary judgment must be "rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

S.Ct. at 2513. *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Although this Court must view the evidence in the light most favorable to the non-moving party, Rule 56 does not relieve the non-movant of all responsibility to rebut the motion.[3] "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. For example, "the plaintiff [may] not defeat the properly supported summary judgment motion of a Defendant charged with a conspiracy without offering 'any significant probative evidence tending to support the complaint.'" *Id.* (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). "Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* 477 U.S. at 257, 106 S.Ct. at 2514.

Finally, in evaluating any motion for summary judgment, the court must bear in mind that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.
>
> *Id.*

## III. LEGAL ANALYSIS

For reasons more fully explained in the discussion below, the Court finds that as a matter of law WSSC exceeded the scope of its legislative authority when it enacted the MPP's restricted bidding provision. Further, the Court finds that while factual questions exist with regard to whether Maryland has a compelling state interest in remedying past discrimination in contracting, the MPP's restricted bidding provision is not sufficiently tailored to remedy past discrimination without unnecessarily burdening the rights of nonminority-owned businesses.

### A. Legal Authority to Enact the MPP

Concrete General contends that WSSC, a state administrative agency, had no legal authority to enact the Minority Procurement Policy restricted bidding provision without some grant of specific authority from the Maryland General Assembly. In response, WSSC acknowledges that it needed legislative authority to create the minority preference program, but argues that the Maryland legislature implicitly vested WSSC with the necessary power by way of the enabling statute, Md.Ann.Code art. 29, § 9–101 (1990), which created WSSC and describes its duties and powers. In particular, WSSC contends that the enabling statute, first enacted in 1918 and then re-enacted in 1961, grants WSSC broad discretionary authority with respect to its procurement contracts, including the implied power to revise those regulations and policies promulgated by WSSC that have a disparate impact upon minority businesses.

■ It is well settled that an administrative agency cannot adopt rules and regulations which exceed the scope of the authority conferred to it by the legislature. A

---

3. Rule 56(e) provides: "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

legislatively delegated administrative power:

> is only the power to adopt regulations to carry into effect the will of the legislature as expressed by the statute. Legislation may not be enacted by an administrative agency under the guise of its exercise of the power to make rules and regulations by issuing a rule or regulation which is inconsistent or out of harmony with, or which alters, adds to, extends or enlarges, subverts, or impairs, limits, or restricts the act being administered.

*Mayor and City Council of Baltimore v. William E. Koons, Inc.,* 270 Md. 231, 310 A.2d 813, 816–817 (1973) (quoting 1 Am. Jur.2d *Administrative Law* § 132 (1962)).

However, while administrative agency powers are indeed limited to the scope of the enabling statute, courts traditionally interpret enabling statutes as granting any and all necessary implied powers to carry out the intent of the legislature.

> In the construction of a grant of powers, it is a general principle of law that where the end is required, the appropriate means are given, and that every grant of [administrative agency] power carries with it the use of necessary and lawful means for its effective execution. There is therefore conferred by necessary implication every power proper and necessary to the exercise of the powers and duties expressly given and imposed.

1 Am.Jur.2d *Administrative Law* § 44 (1986).

In addressing the question of whether WSSC had the implied power to create the MPP, this Court must therefore determine whether the power to create the Minority Procurement Policy is a power "necessary" to enable WSSC to carry out its legislative mandate, or whether, as Plaintiffs contend, the MPP exceeds the scope of rulemaking contemplated by the Maryland General Assembly. As with all questions relating to implied powers, the most obvious starting point is a review of the statutory language of the enabling statute, as well as a review of the general functions and duties of WSSC.

"The Washington Suburban Sanitary Commission (WSSC) was created in 1918 for the purpose of providing, *inter alia,* for the construction, maintenance, and operation of a water supply system in Montgomery and Prince George's Counties. 1918 Md.Laws ch. 122." *Washington Suburban Sanitary Comm'n v. Southern Management Corp.,* 58 Md.App. 136, 472 A.2d 505, 506, *cert. denied,* 300 Md. 317, 477 A.2d 1196 (1984).[4] Md.Ann.Code art. 29, § 9–101 (1990 & Supp.1991) gives WSSC the general power to "adopt rules and regulations to carry out" its duties, § 9–101(a)(1), as well as the specific power to adopt rules and regulations "that WSSC considers necessary for the public ... comfort, or convenience ..." Section 9–101(a)(2)(ii). Defendants argue that these two generally worded provisions grant to WSSC the implied power to enact the MPP.

■ The Court acknowledges that the language of the enabling statute authorizes WSSC to promulgate the necessary rules and regulations to carry out its function. In particular, because no statute dictates the means by which WSSC is to award procurement contracts, the agency retains discretion to structure goods and services contracts in such a way as to effectively carry out WSSC's function.

■ However, the Court finds no evidence that the power to create the MPP is an implied power which is "proper and necessary" to enable the WSSC to carry out its duties in regulating the construction, operation and maintenance of the bi-county area water supply. The Court does not see how denying to WSSC the implied power to create an MPP program impairs WSSC's ability to carry out its legislatively imposed function. *Cf. Maryland Port Admin. v.*

---

**4.** No statute explicitly defines the purpose of the Washington Suburban Sanitary Commission, although § 1–206 permits WSSC to enter into any contracts with local, state or federal governments "concerning any matter necessary, advisable, or expedient for the proper construction, maintenance, and operation of the water supply, sewerage, or drainage systems under the WSSC's control."

*C.J. Langenfelder & Son, Inc.,* 50 Md.App. 525, 438 A.2d 1374, 1386 (1982) (holding that the Board of Contract Appeals had the implied power to impose post-decision interest on award because to deny that power would have rendered the BCA's ability to carry out its function incomplete). Similarly, the Court does not understand how the MPP could be considered a regulation "necessary for the public comfort or convenience." The Court has not been presented with evidence that the Maryland General Assembly ever intended for WSSC to assess the participation of minority contractors in procurement contracts, or that WSSC should be charged with the responsibility of structuring its contracts so as to rectify any perceived inequality.[5]

Further, when taken to its logical extreme, Defendants' argument relating to implied powers goes too far. If WSSC's argument is correct, then every quasi-administrative agency with discretionary power over some part of its function, *e.g.,* structuring its procurement contracts, has the implied authority to adopt a minority-preference program if it is convinced that its method of operation discriminates against minorities. Indeed, under Defendants' interpretation of the enabling statute, there are few affirmative action programs which administrative agencies could not adopt so long as the program was tangentially related to its function. Requiring legislative authority for agency action is particularly important in those instances where the agency takes a constitutionally suspect action, such as drawing race-based classifications for the purpose of allocating government money.

Finally, the Court notes that the Maryland General Assembly has historically delegated the power to create minority preference programs through a grant of specific legislative authority, rather than allowing agencies to interpret a generally worded enabling statute to give rise to implied authority. In 1988, the Maryland General Assembly enacted the Minority Business Participation subtitle of the State Finance and Procurement Code, Md.State Fin. & Proc.Code Ann. § 14–301, *et seq.* (1988 & Supp.1991),[6] which expressly authorizes the Board of Public Works to create a minority preference program for procurement contracts, to be carried out by different agencies. The statute authorizes the Board of Public Works to promulgate the necessary regulations to carry out the subtitle, § 14–303, and sets forth procedures to monitor the success of the program, requiring reports to be made available each year to the legislature. Sections 14–305, 14–306. Analogous in purpose and design to the MPP, the program specifically applies to eight separate agencies, the last of which was added to the list in 1990. The Washington Suburban Sanitary Commission is not among them. Section 14–301.

Similarly, the Maryland General Assembly in 1984 enacted the Mandatory Minority Business Utilization Program, Md.Ann. Code art. 29, § 3–102 (1990 & Supp.1991), to increase minority participation in competitive bidding for construction contracts awarded by WSSC. The statute specifically authorizes WSSC to promulgate rules and regulations to "facilitate the participation of responsible certified minority business enterprises in contracts awarded by the WSSC in accordance with competitive bidding procedures." Section 3–102(d)(2).[7] Unlike the MPP, the statute has

---

**5.** WSSC is not, as defendants claim, analogous to school boards, which derive their authority to adopt minority affirmative action programs from the Supreme Court's mandate in *Brown v. Board of Education,* 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955), where the Court directed school systems to eliminate discrimination. Rather, WSSC has enacted a constitutionally suspect affirmative action program without any grant of authority, either general or specific, from a legislative body or court of law.

**6.** As amended in 1990, the Minority Business Participation Subtitle of the Code authorizes the Board of Public Works to structure procurement procedures to "try to achieve" a minimum of 10% of the dollar value of procurement contracts for each agency awarded directly or indirectly to MBEs. Md.State Fin. & Proc.Code Ann. § 14–302 (1988 & Supp.1991).

**7.** Defendants argue that a specific grant of authority was required to authorize WSSC to create the Mandatory Minority Business Utilization Program because the procurement of construc-

a "sunset" provision, terminating the program after July of 1995. Section 3–102(d)(7).[8]

This legislation constitutes strong evidence that the Maryland General Assembly itself has found it necessary to grant WSSC, in the area of construction contracts, and the Board of Public Works, specific authority to create minority preference programs, rather than allowing those agencies to rely on some vague implied power springing forth from the agencies' general enabling statutes. Furthermore, Defendants presented no evidence of any other administrative agency that had relied on its enabling statute for the authority to create a minority preference policy. In summary, the Court finds that WSSC had no legal authority, express or implied, to create the MPP. However, even if legal authority had existed, the program itself is unconstitutional, as the next section demonstrates.

### B. Constitutionality of the MPP

■ It is well settled that state-created affirmative action programs that draw classifications based on race must be evaluated under a strict scrutiny standard. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986) (plurality opinion); *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978). To survive strict scrutiny, a state-created affirmative action plan must (1) serve a compelling government interest, and (2) be narrowly tailored to the achievement of that goal. *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847. Requiring an affirmative action plan to demonstrate that it serves a compelling governmental interest is a tool designed "to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursu-

ing a goal important enough to warrant the use of a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989). Likewise, requiring that the program be narrowly tailored to "fit" the compelling interest ensures "that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.*

Concrete General argues that under the Supreme Court's affirmative action decisions, particularly the Court's decision in *City of Richmond v. J.A. Croson Co.*, WSSC's Minority Procurement Policy is unconstitutional. In *Croson*, the Supreme Court struck down as unconstitutional a city ordinance requiring prime contractors receiving city construction contracts to subcontract at least 30% of the dollar value of each contract to minority business enterprises. 488 U.S. at 511, 109 S.Ct. at 730. Evaluating the City's plan under the two-prong strict scrutiny test, the Court found first that Richmond had failed to demonstrate the existence of a compelling government interest sufficient to justify drawing a classification based on race. *Id.* at 497–506, 109 S.Ct. at 723–28. In particular, Richmond had failed to adequately prove that minorities had suffered from past discrimination in the Richmond construction contracting industry. *Id.* at 505, 109 S.Ct. at 727. Second, the Court found that the plan was not narrowly tailored to remedy prior discrimination, in part because it was overinclusive. *Id.* at 506–07, 109 S.Ct. at 727–729.

Concrete General argues that the MPP is unconstitutional for the same reasons the Court identified in *Croson*. First, just as in *Croson*, WSSC has failed to factually prove that past discrimination has ever oc-

---

tion contracts is governed by statute, and the program modifies the statutory requirement that the bidding in construction contracts be competitive. However, this argument ignores the fact that the MMBUP does not contravene the competitive bidding process, but merely provides for increased minority participation in competing for contracts "in accordance with competitive bidding procedures." Certainly, under Defendants' arguments WSSC should not

have needed specific authority to enact the program.

8. Originally, the statute was set to terminate after July 9, 1991. The General Assembly extended the program until July of 1995. WSSC–Minority Business Contracts Amendments, ch. 553 (May 24, 1991) (codified as amended at Md.Ann.Code art. 29, § 3–102 (1990 & Supp. 1991).

curred, and thus cannot assert that it has a compelling state interest in remedying past discrimination in procurement. Second, the plan is not sufficiently tailored to achieve WSSC's purported interest in remedying past discrimination because, like the plan in *Croson*, the MPP is overinclusive and poorly drawn in light of its asserted purpose. The Court addresses each claim in turn.

### 1. Compelling State Interest

■ The Supreme Court has held in several recent cases that the government's interest in remedying the effects of past discrimination is a sufficiently compelling government interest to justify the use of a race-based affirmative action program. *See Croson*, 488 U.S. at 504, 109 S.Ct. at 727; *Wygant*, 476 U.S. at 277, 106 S.Ct. at 1848; *Bakke*, 438 U.S. at 307, 98 S.Ct. at 2757. However, a government may not justify affirmative action programs by pointing to past general societal discrimination in an entire industry, primarily because the concept " 'has no logical stopping point' " and could lead to a society built around rigid racial quotas. *Croson*, 488 U.S. at 498, 109 S.Ct. at 723 (quoting *Wygant*, 476 U.S. at 275, 106 S.Ct. at 1847). Instead of pointing to general societal discrimination, Defendants must provide a specific evidentiary "showing of prior discrimination by the governmental unit involved" before the limited use of racial classifications to remedy such discrimination can be allowed. *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847.

In *Croson*, the Court held that Richmond had failed to factually prove its assertion that it had a compelling state interest in remedying prior discrimination against minority construction contractors by the city. In particular, the Court found that Richmond could not prove that prior discrimination had ever occurred against Richmond minority construction contractors, because the city's statistical comparisons between the number of contracts awarded to minority firms and the overall minority population of Richmond did not prove discrimination. 488 U.S. at 501, 109 S.Ct. at 725. The Court concluded that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Id.* (quoting *Hazelwood School Dist. v. United States*, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977)). Instead, the Court found that to determine whether prior discrimination had taken place, the correct statistical comparison was between the number of minority businesses awarded contracts and the number of minority businesses actually qualified to receive the contracts. *Id.*

■ In this instance, Plaintiff contends that WSSC's statistics suffer from the same statistical defect as did the statistical comparisons in *Croson*, namely that WSSC compared the number of minority business contracts to the minority population at large, rather than to the number of qualified minority-owned businesses. The Court finds the issue to be a disputed question of fact, which cannot be resolved within the summary judgment context. In particular, Defendants present statistical comparisons drawn from WSSC Procurement Department Activity Reports, collected in 1983, which indicate that the Department had approximately 6,500 firms on its bid list, of which 6.54% were Minority Business Enterprises. However, during 1983, the Activity Reports appear to indicate that those same firms received only 3% of the total contract dollars awarded for procurement contracts. The comparisons in the Activity Reports appear to be precisely of the type recommended in *Croson*, *i.e.*, the number of contracts actually awarded to minority-owned contracting firms compared with the number of qualified minority firms eligible to receive such contracts. Defendants present further statistical and anecdotal evidence supporting the proposition that prior to the enactment of the MPP, minority-owned firms were being excluded from the bidding process for WSSC procurement contracts.

With regard to the Activity Reports, Concrete General disputes whether the MBEs included on the bid list are necessarily qualified MBEs. Concrete General further con-

tends that the market for roadway paving contracts, in contrast to the broader market for general procurement contracts, is the relevant market from which to draw statistics. However, for the purposes of deciding the motion to dismiss, the Court must assume as true Defendants' contention that the Procurement Activity Reports reflect a significant disparity between the number of qualified MBEs and the number of contracts which are in fact awarded to MBEs. Given that assumption, the Court cannot say that as a matter of law, WSSC had no factual predicate demonstrating that WSSC had in past instances discriminated against minority-owned contractors with respect to procurement contracts. Nevertheless, as the next section discusses, even assuming that Plaintiffs could clearly prove a factual predicate to establish past discrimination, the MPP is not sufficiently tailored to achieve that purpose, and thus the Court remains unconvinced that the program was designed specifically to remedy past discrimination.

## 2. Narrowly Tailored Program

In addition to demonstrating some compelling government interest in remedying past discrimination, Defendants must also demonstrate that the MPP is "narrowly tailored" to serve the interest of remedying past discrimination. *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1846. The Supreme Court has held that affirmative action plans need not be the least drastic means of achieving a remedy, but rather should be evaluated with respect to four factors to determine whether a sufficient nexus exists between method and purpose: (a) the necessity for relief and the efficacy of alternative, race-neutral remedies; (b) the flexibility and duration of the relief, including the availability of waiver provisions; (c) the relationship of the numerical goals to the relevant labor market; and (d) the impact of relief on the rights of third parties. *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987).

### (a) Necessity for Relief, Less Drastic Alternatives

In *Croson,* the Court found it relevant that the minority business set-aside at is-

sue applied to Spanish-speaking, Oriental, Indian, Eskimo and Aleut persons, even though Richmond had offered no evidence of past discrimination against those groups. 488 U.S. at 506, 109 S.Ct. at 728. The Court saw the decision to include those groups as evidence that the program had not in fact been designed to remedy past discrimination, although Richmond had asserted that goal as the motive behind the set-aside. "The random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the [industry], suggests that perhaps the city's purpose was not in fact to remedy past discrimination." *Id.*

In this case, the MPP is, by WSSC's own admission, over-inclusive, providing special treatment for minority-owned firms located outside Prince George's and Montgomery Counties, and including racial and ethnic groups for which no evidence has been offered to prove prior discrimination. The MPP sets forth a list of minority groups which qualify as MBEs, including African–Americans, Hispanics, American Indians, Alaskan Natives, Asians, mentally and physically disabled, Pacific Islanders, and women. MPP § C(6)(a)(2). However, WSSC concedes that it can provide no factual evidence to justify extending the MPP to any group other than African–Americans.

WSSC argues that despite the facial overinclusiveness of the definition, the Court cannot find the program to be unconstitutional because the MPP was applied in this instance to benefit an African–American owned firm, a group that WSSC asserts it can prove has suffered from the effects of prior discrimination. The Court is not persuaded, however, that it should ignore evidence which indicates that the program as designed is insufficiently tailored to achieve WSSC's asserted interest in remedying instances of prior discrimination. It may well be that no Alaskan or Pacific Islander owned firm has ever worked in either Prince George's or Montgomery Counties, and the fact that the MPP in-

cludes those groups in its definition of a minority-owned firm strongly suggests that the policy was not designed to remedy past discrimination.

Relatedly, the MPP contains no geographical limitation restricting benefits under the program to contractors in Prince George's and Montgomery Counties. As Plaintiff points out, a Pacific Islander from outside the bi-county area could be eligible for benefits under the program, despite the absence of any evidence that this individual firm ever suffered from prior discrimination at the hands of WSSC. Defendants argue that notwithstanding the lack of a geographical restriction, practically speaking most of the procurement contracts let by WSSC come from local contracting firms, and thus no real danger exists that the program will apply to benefit firms outside the region. Further, Defendants argue that for those contracts which might be awarded to firms outside the region, the relevant market for those contracts is likely to be national and not local. While these facts may be true, the lack of a geographical limitation allows for the possibility that firms from just outside the area, for example Virginia, might be awarded contracts by virtue of the MPP when those firms have never suffered past discrimination at the hands of WSSC. The absence of a geographical restriction contributes further to the Court's overall conclusion that the MPP was not enacted to remedy past discrimination, but was adopted instead to provide a minority firm with benefits based only on its status as a minority firm. *See Croson*, 488 U.S. at 508, 109 S.Ct. at 729 (affirmative action program must be tailored as narrowly as possible to include only those firms that have suffered prior discrimination at the hands of the governmental unit involved).

Further contributing to that conclusion is the fact that, like the city in *Croson*, WSSC does not appear to have considered the use of race-neutral means to increase participation by minority-owned businesses in city contracting, before resorting to the more drastic alternative of enacting a minority business set-aside. *Croson*, 488 U.S. at 507, 109 S.Ct. at 728. The *Croson*

Court noted the possibility that many of the barriers to minority participation in construction were race-neutral, *e.g.*, lack of capital or the inability to meet bonding or insurance requirements. *Id.*

WSSC argues that it considered several race-neutral alternatives before adopting the restricted bidding provision. First, WSSC points out that it was only after the competitive bidding process had proved itself to be ineffective that WSSC adopted the MPP. Further, WSSC argues that the MPP contains two race-neutral provisions which can be used in conjunction with the race-conscious measures of the MPP to increase minority participation in contracting. In particular, the MPP allows the Purchasing Agent to choose (1) a reduction or waiver of bonding and insurance requirements for minority-owned firms, and/or (2) a waiver of the corporate experience requirements for minority-owned firms. MPP § C(1)(b)(5), (6).

■ The fact that the competitive bidding process has failed to achieve nondiscriminatory results does not excuse WSSC from exploring whether any race-neutral remedies would ameliorate the effects of racial discrimination in WSSC's programs. *Compare Fullilove v. Klutznick*, 448 U.S. 448, 463–67, 100 S.Ct. 2758, 2767–69, 65 L.Ed.2d 902 (1980) (race-neutral remedies had clearly failed to combat racial discrimination *before* non-neutral affirmative action program instituted). Moreover, the Court does not accept WSSC's argument that the two provisions it points to in the MPP constitute race-neutral alternatives as the concept is discussed in *Croson*. The two cited provisions provide bidding advantages for minority-owned businesses only, and thus cannot be considered race-neutral. *See Croson*, 488 U.S. at 507, 109 S.Ct. at 728 (program of city financing for *all* small firms is example of race-neutral remedy).

The Court acknowledges that the MPP contains certain less drastic alternatives than the restricted bidding provision in question. While the provisions relating to bonding, insurance, and corporate experience requirements are less intrusive than

the restricted bidding provision, no evidence exists to indicate whether in this instance WSSC considered using those provisions, or the less intrusive price-preference or subcontractor goal provisions of the MPP, before resorting to the most drastic method, the restrictive bidding provision.

In fact, the criteria by which the Purchasing Agent selects the appropriate procedure does not direct the Agent to consider the less intrusive procedures before employing the more intrusive ones. Instead, the criteria encourage the Agent to choose the procedure that is "most effective" in achieving the Commission's goals, which include a target goal of awarding 25% of available procurement contract dollars to minority-owned firms. MPP § C(1)(c)(4). The Court finds no evidence to suggest that WSSC considered the use of race-neutral alternatives before adopting the restricted bidding provision with respect to Contract B.

*(b) Flexibility and Duration of Relief*

■ In *Croson*, the Court noted its constitutional preference for programs that provide for an individualized inquiry, *i.e.*, an inquiry into whether a particular minority-owned firm has suffered and continues to suffer from the effects of discrimination, before classifying the firm as eligible to receive benefits. 488 U.S. at 508, 109 S.Ct. at 728. The *Croson* Court noted that unlike the program evaluated in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758 (1980), which included a waiver provision for MBEs whose higher bid was not attributable to the effects of past discrimination, the Richmond program's waiver provision focused solely on the availability of MBEs. *Id.* 488 U.S. at 508, 109 S.Ct. at 728–29.

In this instance, the absence in the MPP of individualized waiver provisions, and in particular, graduation and termination provisions, indicate that the policy is not sufficiently flexible or temporary in application to satisfy the Court that it is merely remedial. The MPP has no provision to "graduate" from the program those contracting firms which have demonstrated the ability to effectively compete with non-MBEs in a competitive bidding process.[9] Nor does the MPP have waiver provisions to allow WSSC to choose not to apply the MPP requirements.[10] Thus, this Court finds that the program is not targeted towards enabling minority-owned firms to overcome past discrimination, but rather, is designed merely to achieve a particular racial balance of minority-owned firms to nonminority-owned firms.

The Court also notes that the MPP does not have a provision to terminate the program once it has served its purpose. It is significant that in several instances where the Supreme Court has upheld affirmative action measures as constitutional, the remedial measures have been temporary in duration, a factor which the Supreme Court has found relevant in determining whether the program was sufficiently tailored to its goal. *See e.g., Paradise*, 480 U.S. at 189, 107 S.Ct. at 1075–76; *Local 28 of Sheet Metal Workers' Int'l Ass'n v. Equal Employment Opportunity Comm'n*, 478 U.S. 421, 479, 106 S.Ct. 3019, 3051, 92 L.Ed.2d 344 (1986). In those instances, the preferential selection of employees was destined to end at the time when the percentage of minority hirees approximated the percentage of minorities in the local labor force. *See Sheet Metal Workers*, 478 U.S. at 479, 106 S.Ct. at 3051.

**9.** In contrast, Md.Ann.Code art. 29, § 3–102, which applies to construction contracts, was amended in May of 1991 to add provisions to allow waiver of the program "if the WSSC determines that the application of the program to contracts conflicts with the WSSC's overall objectives and responsibilities," § d(3)(iv), and, most importantly, "to provide for the graduation of [an MBE] if the WSSC determines that the [MBE] no longer requires the assistance or benefits offered by the program." Section d(3)(v). WSSC–Minority Business Contracts, ch. 553 (May 24, 1991) (codified as amended at Md.Ann.Code art. 29, § 3–102 (1990 & Supp. 1991)).

**10.** The waiver provisions cited by Defendants in their brief are those enacted as part of the MMBUP, Md.Ann.Code art. 29, § 3–102, which applies to construction contracts, and are not part of the MPP.

In this instance, however, the program is not designed to end when the percentage of minority-owned firms receiving contracts approximates the percentage of qualified MBEs in the labor pool, or even when the program achieves its stated goal of awarding 25% of contract dollars to minority-owned firms. Although the program is subject to review by WSSC every year to decide whether to modify the program, the Policy will continue in effect indefinitely unless WSSC votes to modify the program. The Court finds it significant that the MPP establishes no definitive criteria by which WSSC is to judge whether the program need continue.

In contrast, the Mandatory Minority Business Utilization Program, specifically authorized by the Maryland General Assembly, contains a definitive ending date, at which time the legislature will have to decide whether to renew the program after having conducted a factual investigation to assess the results of the program. Md. Ann.Code art. 29, § 3–102 (1990 & Supp. 1991).[11] The lack of an expiration date or graduation provision for the MPP belies Plaintiffs' claim that the policy is geared toward the particularistic goal of remedying past discrimination.

### (c) Relationship of Numerical Goals to the Labor Market

■ In *Croson*, the Court found that the rigid numerical quota of 30%, which roughly approximated the 30% minority composition in Richmond, was unrelated to any goal, "except perhaps outright racial balancing." 488 U.S. at 507, 109 S.Ct. at 728. In challenging the idea that the percentage of minority contracting firms receiving contracts should approximate the percentage of minorities in the general population, the Court noted that the 30% figure "rests upon the 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." *Id.* (quoting *Sheet Metal Workers*,

478 U.S. at 494, 106 S.Ct. at 3060 (O'Connor, J., concurring in part and dissenting in part)).

Similarly, in this case, the MPP's numerical goal, although not a rigid numerical quota, substantially exceeds the percentage of qualified minority-owned firms in the workplace. Instead, the goal figure roughly approximates the percentage of minorities in the overall population in the bi-county area. The MPP was designed in 1985 with the goal of eventually awarding 25% of procurement contract dollars to minority-owned businesses. MPP § C(1)(b). Plaintiff presents statistics which indicate that minorities constitute 20–25% of the general population in the bi-county area over which WSSC has jurisdiction. Defendants present statistics which indicates that qualified minority-owned contracting firms make up only 6.54% of the labor market. These facts lead the Court to believe that WSSC set the 25% goal by referring to the 20–25% minority population residing in the bi-county area, rather than by referring to the percentage of qualified minority-owned firms in the work force. Such overbreadth contributes to the Court's conclusion that the goal of the MPP, like the minority set-aside provision in Richmond, is designed to achieve the award of contracts to minority-owned firms in proportion to the percentage of minorities in the general population, rather than to remedy past discrimination within the specific workplace.

### (d) Burden on Third Parties

The MPP imposes a substantial burden on innocent third parties, namely, those non-MBE firms that are excluded from bidding on roadway paving contracts because of the restricted bidding provision. As noted above, the MPP restricted bidding provision does not impose a temporary and limited burden on nonminority contracting firms, but instead, threatens to indefinitely preclude nonminority contractors from bidding on particular types of contracts. *Cf.*

---

11. The General Assembly has extended the program for another term, to end in July of 1995. WSSC–Minority Business Contracts, ch. 553

(May 24, 1991) (codified as amended at Md.Ann. Code art. 29, § 3–102 (1990 & Supp.1991)).

*Paradise,* 480 U.S. at 181, 107 S.Ct. at 1073 (the temporary and limited nature of the requirement substantially limits any potential burden on nonminority applicants). Under the restricted bidding provision, nonminority contractors are absolutely barred from bidding on those contracts the Purchasing Agent sees fit to restrict. While denying future employment opportunities does not impose as harsh a burden as requiring layoffs, the restricted bidding provision imposes a substantial burden on non-MBE firms. Moreover, the extended duration of the provision threatens that the burden will last indefinitely.

### 3. Constitutionality

After reviewing all the indicia relevant to an evaluation of the constitutionality of the MPP restricted bidding provision, the Court finds that the MPP is not sufficiently tailored to achieve its purported purpose of remedying past discrimination by WSSC against minority contractors in the bi-county area. This failure to narrowly tailor the MPP renders the restricted bidding provision unconstitutional. Thus, this Court finds that the provision violates the Equal Protection Clause of the Fourteenth Amendment, and is therefore, invalid.

### IV. CONCLUSION

For the foregoing reasons, the Court holds that:

1. There is no genuine issue of material fact necessary to this decision.

2. Defendant Washington Suburban Sanitary Commission exceeded the scope of its legislative authority when it enacted the MPP's restrictive bidding provision.

3. Even if it were authorized, the MPP's restrictive bidding provision violates the Equal Protection Clause of the Fourteenth Amendment.

4. Summary Judgment shall be granted to Plaintiff Concrete General, Inc.