[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 04-12900

_____

D. C. Docket No. 97-03485-CV-CAP-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 13, 2005
THOMAS K. KAHN
CLERK

PARAMIJIT S. VIRDI, and all
others similarly situated
d.b.a. Virdi Architects & Associates,

                                        Plaintiff-Appellant,

versus

DEKALB COUNTY SCHOOL DISTRICT,
ELIZABETH ANDREWS,
WILLIAM BRADLEY BRYANT,
FRANCES EDWARDS,
LYNN CHERRY GRANT et al.,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 13, 2005)

Before ANDERSON, PRYOR and HILL, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Paramijit S. Virdi is an architect and an Asian-American of Indian descent. He brought claims against the DeKalb County School District, the members of the DeKalb County Board of Education (both individually and in their official capacities), and Superintendent James Hallford (both individually and in his official capacity) pursuant to 42 U.S.C. §§ 1981 and 1983 and the Fourteenth Amendment, alleging that they discriminated against him on the basis of race when awarding architectural contracts.[1] He also argued that the school district's Minority Vendor Involvement Program is facially unconstitutional. After the district court granted Defendants-Appellees' ("Defendants") motion for summary judgment on all of Virdi's claims, a panel of this court reversed in part, vacated in part, and remanded the case to the district court. On remand, the district court granted Defendants' motion for partial summary judgment on Virdi's facial challenge. The district court then granted Defendants' motions for judgment as a matter of law on the remaining claims at the close of Virdi's case in chief.

## I. Factual and Procedural Background

A. The Tillman Committee and Report

In 1989, the DeKalb County School Board ("the Board") appointed the

---

[1] Only the District itself and Hallford remain as defendants.

Tillman Committee ("the Committee") to study female and minority business involvement with the DeKalb County School District ("the District"). After several meetings with various District departments and a number of minority contractors who had unsuccessfully attempted to solicit District business, the Committee issued a report ("the Tillman Report") stating the Committee's impression that "[m]inorities ha[d] not participated in school board purchases and contracting in a ratio reflecting the minority make up of the community." The Tillman Report was based only on the Committee's "general feeling" that minorities were under-represented; there was no specific evidence of past discrimination, nor did the Committee make any factual findings regarding such discrimination. Nevertheless, in order to ensure that minorities had an equal opportunity to compete going forward, the Tillman Report recommended that the District (1) advertise bids and purchasing opportunities in newspapers targeting minorities, (2) conduct periodic seminars to educate minorities on doing business with the District, (3) notify organizations representing minority firms regarding bidding and purchasing opportunities, and (4) publish a "how to" booklet to be made available to any business interested in doing business with the District.

The Tillman Report also recommended that the District adopt annual participation "goals" for minority involvement. The recommended goals for

contracts, purchases, and services were 15% for "Black Businesses," 5% for "Female Businesses," and 5% for "Other Minorities." The Tillman Report included several statements to the effect that the actual selection process was to remain race neutral. It also emphasized that the "goals" were aspirational rather than mandatory, and should not be taken as a call for preferential treatment. Finally, it recommended that the Board adopt a non-discrimination statement.

B. The Minority Vendor Involvement Program

The Board adopted the Tillman Report in March 1991. It subsequently began advertising contracting opportunities in the Atlanta Journal-Constitution, conducting quarterly seminars on how to do business with the District, and publishing the recommended handbook.

In addition to these community outreach activities, the Board began implementing a Minority Vendor Involvement Program ("MVP") in March 1991. The MVP's stated goal was to "provide increased opportunities for blacks, women, and other minorities to engage in business activities within the School System." It was intended to educate the public on how to do business with the District, monitor minority participation, and evaluate the effectiveness of the District's strategies to increase minority involvement. The MVP adopted the minority participation goals outlined in the Tillman Report. It has operated continuously since its inception,

4

and there are no known plans to terminate it. Minority participation has increased each year since the implementation of the MVP.

C. The Selection of Architects

The Board has delegated the responsibility of selecting architects to the Superintendent.[2] The Superintendent receives recommendations from his staff, specifically the Deputy Superintendent for Business Affairs and the Executive Director of Plant Services and Development (the "Executive Director"). The Executive Director, in turn, accepts recommendations from his staff, specifically the Manager of Facilities and Construction (the "Manager"). The Superintendent bears the ultimate responsibility for selecting architects. The Board has no role in architect selection or approval.

The parties disagree about the application process that architects must go through in order to be considered for District projects. The District claims that interviews are set up when an architectural firm calls and requests a meeting or sends in an informational packet and follows up with a phone call. The District maintains that a firm must contact the District and schedule an interview in order to be considered. Virdi claims he was told in 1991 and 1994 that the District retains a

---

[2] At the time this lawsuit was filed, Defendant-Appellee James Hallford was the DeKalb County Superintendent.

resource file of all qualified architects who have submitted their qualifications and that it chooses architects from that file as needed. He claims he was never told that he needed to call and schedule an interview in order to be considered.

D. Virdi's Interaction with the District

Virdi first contacted the District in October 1991, by sending a letter expressing interest in obtaining architectural contracts.[3] Virdi sent his letter to then-Manager C. H. Huff. Virdi followed up on his letter by submitting promotional literature discussing his firm's qualifications and by contacting Huff's office again in March of 1992 and December of 1993.

Virdi again contacted the District in August 1994, this time through Jeff Prine, a project manager employed by Heery International. Virdi called Prine, sent him a qualifications package, and then called him again in September to follow up. Prine told Virdi that Virdi's firm had not been selected. Prine also allegedly told Virdi that the rejection was not based on a lack of qualifications, but was because the District was only looking for "black owned firms." Virdi subsequently sent Prine a letter asking him to confirm this statement in writing. Instead of responding to the letter, Prine forwarded it to then-Manager Richard Beard. No

---

[3] It is settled that the statute of limitations bars any claim based on events occurring prior to November 19, 1995.

6

District official ever responded to Virdi's letter.

About the same time as his letter to Prine was being forwarded up the District's chain of command, Virdi tried to set up a meeting with Beard. He met instead with Beard's assistant, Bob Cox, on September 21, 1994. Virdi asked Cox how to ensure that he was considered for future architectural projects and was told that projects were assigned out of the District's resource files.

In July of 1996,[4] the District hired Mike Cunningham as its new Manager and Dr. Stanley Pritchett as its new Executive Director. Neither Cunningham nor Pritchett received any information about architects who had previously submitted their qualifications.

One of the reasons that Cunningham and Pritchett did not need information about previous applicants is that the District was inundated with inquiries from architectural firms in 1996 as a result of the anticipated passage of a Special Purpose Local Option Sales Tax ("SPLOST"). The District began selecting firms for phase one SPLOST projects in late 1996 and completed the process in early 1997. All of those projects were assigned to architects who contacted the District during the summer and fall of 1996. Virdi did not contact the District during that

---

[4] While the statute of limitations allows Virdi to base a claim on any actions occurring after November 19, 1995, no projects were taken on between that date and July 1996.

time. The District maintains that, unless a specialty firm was needed, all SPLOST projects were to be assigned from the list of architects prepared in late 1996 and early 1997.

In September 1997, Virdi met with Dr. Edwards, the District's Director of Community Affairs. During the meeting, Virdi mentioned Prine's claim that the District only wanted to hire black-owned firms. Edwards did not confirm or deny this statement, but he did arrange a meeting between Virdi and Dr. Tucker, the District's Equal Employment Opportunity Director.

Virdi also telephoned Pritchett in September 1997. Virdi repeated Prine's statement to Pritchett, who asked Virdi to resubmit his qualifications. Pritchett met with Virdi after receiving his qualifications. He told Virdi that the District would keep Virdi's firm in its files, but that it was too late to be considered for phase one or two SPLOST projects. However, Pritchett said that Virdi could be considered for phase three SPLOST work. Virdi filed the instant claims before any phase three SPLOST projects were assigned.

E. Procedural History

Virdi filed his complaint on November 19, 1997, alleging individual and class claims of race and ethnicity discrimination in the making and enforcement of contracts in violation of 42 U.S.C. § 1981 and race and gender discrimination in

8

violation of his right to equal protection as secured by the Fourteenth Amendment and 42 U.S.C. § 1983.[5]  He also brought a facial challenge to the constitutionality of the MVP.  He named the DeKalb County School District, Superintendent Hallford, and the members of the DeKalb County Board of Education (who have since been dismissed from the case) as Defendants.  The district court granted Defendants' motion for summary judgment on August 14, 2000, holding that Virdi had presented insufficient evidence of discrimination, that no official policy discriminated against him, and that Superintendent Hallford was immune from liability.  Virdi appealed to this court, and we reversed the district court's holding on Virdi's race discrimination claims, vacating the district court's grant of summary judgment with respect to both the District and Hallford.

On remand, the district court granted a partial summary judgment in Defendants' favor, holding that the MVP was facially constitutional.  Virdi's remaining claims were set for trial on May 3, 2003.  The issue for trial was whether Defendants had intentionally discriminated against Virdi on the basis of race in awarding architectural contracts.  After Virdi presented his case in chief, the district court granted Defendants' motion for judgment as a matter of law on all of

---

[5] Virdi's motion for class certification was denied by the district court and was not appealed.  Virdi has similarly abandoned his ethnicity and gender discrimination claims.

9

Virdi's claims.  Virdi timely appealed that order.

## II. Standard of Review

We review <u>de novo</u> a district court's grant of summary judgment, applying the same legal standards used by the district court.  <u>Kingsland v. City of Miami</u>, 382 F.3d 1220, 1225 (11th Cir. 2004).  The district court's decision to grant judgment as a matter of law is also reviewed <u>de novo</u>, and should be upheld if "the facts and inferences point so strongly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict."  <u>Lipphardt v. Durango Steakhouse of Brandon, Inc.</u>, 267 F.3d 1183, 1186 (11th Cir. 2001) (internal citation omitted).

## III. Analysis

A. <u>The Facial Challenge to the MVP</u>[6]

In granting the Defendant-Appellees' motion for summary judgment on Virdi's facial challenge, the distirct court noted that the MVP did not expressly endorse any discriminatory behavior or contemplate any adverse action if the goals

---

[6] Defendants argue that Virdi has waived his facial challenge to the MVP by failing to cite the issue in his notice of appeal as required by Rule 3(c) of the Federal Rules of Appellate Procedure.  We disagree.  The district court's order granting summary judgment on Virdi's facial challenge was an interlocutory order which merged into the final judgment.

were not met.[7]  Because the MVP did not direct government actors to withhold or confer benefits based on the race of the applicant, the district court concluded that Virdi's equal protection rights were not violated and that the MVP was not subject to strict scrutiny.  We disagree.

It is well settled that "all racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny.'"  Grutter v. Bollinger, 539 U.S. 306, 326, 123 S. Ct. 2325, 2337 (2003) (quoting Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S. Ct. 2097, 2113 (1995)).  To the extent that Defendants argue that the MVP did not contain racial classifications because it did not include set-asides or mandatory quotas, we note that strict scrutiny applies to *all* racial classifications, not just those creating binding racial preferences.  The MVP includes racial classifications.  It is therefore subject to strict scrutiny.  See Grutter, 539 U.S. at 326, 123 S. Ct. at 2337-38; accord Eng'g Contractors Ass'n of South Florida Inc. v. Metro. Dade County, 122 F.3d 895 (11th Cir. 1997).

While it is a searching inquiry, "[s]trict scrutiny is not 'strict in theory, but fatal in fact.'"  Id., 123 S. Ct. at 2338 (quoting Adarand, 515 U.S. at 227, 115 S. Ct. at 2113).  A race-based classification will survive strict scrutiny if it is narrowly

---

[7] The district court also noted that the MVP's goals are expressly subjugated to the interests of competitive bidding and cost minimalization.  This is not persuasive in this case, however, as the District abandons its normal practice of automatically awarding contracts to the lowest bidder in favor of a subjective selection process when hiring architectural firms.

11

tailored to serve a compelling government interest. Although its primary holding was that the MVP was not subject to strict scrutiny, the district court alternately held that the MVP meets this standard because it is "narrowly tailored to the compelling state interest of tracking its activities to ensure that it is not unwittingly discriminating against any legally protected group of citizens." Again, we are forced to disagree with the district court's analysis.

As an initial matter, we are not at all convinced that the government interest identified by the district court is compelling. However, we need not decide that issue, as it is clear that the MVP's race-based participation goals are not a narrowly tailored means of serving that interest.

The MVP's racial goals are not narrowly tailored for two reasons. First, there is no evidence that the District considered race-neutral alternative means of tracking its activities to avoid unwitting discrimination. While narrow tailoring does not require exhaustion of every conceivable race-neutral alternative, it does require serious, good faith consideration of whether such alternatives could serve the governmental interest at stake. Grutter, 539 U.S. at 339, 123 S. Ct. at 2344-45 (citing Wygant v. Jackson Bd. of Ed., 476 U.S. 267, 280 n.6, 106 S. Ct. 1842, 1850 n.6 (1986), and Richmond v. J.A. Croson Co., 488 U.S. 469, 509-10, 109 S. Ct. 706, 730 (1989)). In the instant case, a number of race-neutral alternatives would

be at least as effective as the MVP's percentage goals in helping the District track its activities to avoid unintentional discrimination.[8] Because the state's proffered interest could be served equally well by race-neutral measures, the adoption of a racial classification is not narrowly tailored to achieving that interest.

The unlimited duration of the MVP's racial goals also demonstrates a lack of narrow tailoring. As the Supreme Court has stated, "race conscious . . . policies must be limited in time." Grutter, 539 U.S. at 342, 123 S. Ct. at 2346; see also Walker v. City of Mesquite, TX, 169 F.3d973, 982 (5th Cir. 1999) (citing United States v. Paradise, 480 U.S. 149, 171, 107 S. Ct. 1053, 1066 (1987)) (listing duration as a factor to consider when assessing whether a race-conscious policy is narrowly tailored). While the District's effort to avoid unintentional discrimination should certainly be ongoing, its reliance on racial classifications should not.

Because the government interest at stake in this case could be achieved through race-neutral means, and because the racial classifications in question are not temporally limited, the MVP's racial goals cannot withstand strict scrutiny. The program is facially unconstitutional, and the district court erred in granting Defendants' motion for partial summary judgment on this issue. The district

---

[8] For instance, the District could simply have employed its outreach procedures and tracked the participation and success of qualified minority-owned businesses in the bidding process as compared to that of similar non-minority owned firms.

court's order granting partial summary judgment is therefore reversed, and the case will be remanded to the district court for further proceedings consistent with this opinion.

B. The Intentional Discrimination Claim

Given our holding with respect to Virdi's facial challenge, we must disagree with the district court's holding that the District had no unconstitutional policy in place. Nevertheless, the District is still entitled to judgment on Virdi's intentional discrimination claim. While the MVP's goals themselves are unconstitutional, they do not constitute evidence that Virdi himself was discriminated against.[9] There is no evidence that the MVP or its unconstitutionality caused Virdi to lose a contract that he otherwise would have received. Thus, Virdi has failed to establish a causal connection between the unconstitutional aspect of the MVP and his alleged injury – i.e., the failure to obtain architectural work with the District. Moreover, there is insufficient other evidence to impose liability upon the District for damages to Virdi for intentional discrimination.[10] Thus, the district court did not err in granting judgment in favor of the District on Virdi's intentional discrimination

---

[9] Indeed, implementation of the goals might have been of assistance to Virdi in obtaining employment.

[10] Virdi's flawed statistics cannot provide evidence of intentional discrimination against him. And, as noted below, Virdi has failed to adduce sufficient evidence to create a jury question of intentional discrimination on the part of either Pritchett or Hallford.

14

claim.

With respect to Virdi's claims against Hallford, the undisputed evidence is that Hallford simply accepted the recommendations he received from Pritchett. Pritchett took over as Executive Director in mid-1996 and had no knowledge of the resource files kept by his predecessors. He had no need to know the contents of those files, because during the summer and fall of 1996 he was inundated with calls from architectural firms seeking to work on SPLOST projects. The list of architects approved to work on SPLOST projects (the "SPLOST list"), which was prepared in late 1996 and early 1997, consisted solely of those current contacts. At trial, Virdi failed to present sufficient evidence from which a jury could conclude that he contacted Pritchett's office and requested an interview during that time period; his first and only meeting with Pritchett took place in the fall of 1997, after the completion of the SPLOST list. Virdi also failed to adduce evidence that would allow a jury to disbelieve Pritchett's uncontradicted testimony that all non-speciality firms that worked on SPLOST projects were selected from the SPLOST list.[11] Because Virdi did not adduce evidence from which a jury could conclude

_____

[11] Virdi testified that he was told on earlier dates by persons who worked for Pritchett's predecessors-in-office that architect selections were made from the resource files and that his submissions for the resource files in 1991 and 1994 were all that he needed to be considered. However, such testimony cannot create a jury issue in light of Pritchett's uncontradicted testimony that both he and the Manager, Cunningham, came on board later, in mid-1996, that shortly thereafter they were inundated with applications from architectural firms

15

that Pritchett intentionally discriminated against him, he certainly failed to do so with respect to Hallford, who merely acted on Pritchett's recommendations. The district court correctly granted Hallford's motion for judgment as a matter of law.[12]

## IV. Conclusion

For the foregoing reasons, we AFFIRM the district court's order granting the District's and Hallford's motion for judgment as a matter of law on Virdi's intentional discrimination claims. However, we REVERSE its order granting the District's motion for partial summary judgment on the facial constitutionality of the MVP's racial goals, and the case is REMANDED to the district court for further proceedings consistent with this opinion.

---

in light of the publicity surrounding the upcoming referendum which would fund substantial school construction, and that they naturally selected the list of architects in late 1996 and early 1997 solely from those current applications. Although a jury might well infer that Virdi suffered from an unintentional misunderstanding, no reasonable jury could infer intentional discrimination on the part of Pritchett on the basis of the testimony at trial.

    For similar reasons, Virdi's reliance on the testimony of Prine is misplaced. Prine was working with the school system during an earlier time frame and under different decision-makers. Moreover, in addition to being remote in time, Prine's allegation related to contractors, not architects.

[12]    We are aware that a prior panel of this court held that the district court erred in granting summary judgment on grounds somewhat similar to those relied upon in this opinion. However, because that opinion addressed summary judgment and relied only on the pre-trial record, it is not law of the case. After a careful review of the evidence presented at trial, particularly the testimony of Virdi and Pritchett, we are satisfied that Virdi has not presented evidence that would allow a jury to conclude that he was a victim of intentional discrimination, and that the district court correctly granted Defendants' motion for judgment as a matter of law.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.