Dear Mr. Prem P. Agarwal
On behalf of the Washington Suburban Sanitary Commission ("WSSC"), you have requested our opinion concerning the WSSC's authority to take certain actions after the recent expiration of the statutes that authorized it to adopt a program, including race and gender conscious policies, to increase the participation of minority business enterprises ("MBEs") in WSSC contracting. You advise that the WSSC has adopted a "Stop Gap MBE Program" — essentially, an MBE program that mirrors the program previously authorized by statute — but is delaying implementation of that program until it is determined whether the program is lawful. You ask:
(1) Would adoption, implementation, and enforcement of the Stop-Gap MBE Program be lawful?
(2) If the Stop-Gap MBE program is not lawful, may the WSSC lawfully adopt other race and gender-conscious policies to promote the award of WSSC contracts to MBEs?
You submitted an opinion of the WSSC General Counsel concerning the authority of the WSSC to maintain an MBE program after the expiration of the enabling statute. That opinion concluded that operation of such a program without statutory authority would contravene the Legislature's intent in allowing the enabling legislation to expire, that the WSSC must therefore terminate race and gender-conscious policies, that individual commissioners and managers could be subject to personal liability if contracts were awarded based on race-conscious policies that are unambiguously unlawful, and that the WSSC needs to update its data gathering capability to be able to conduct an adequate analysis of the utilization of MBEs in construction subcontracting.
We agree with your General Counsel that, in the absence of statutory authority, the WSSC MBE program should not be continued, even under a new temporary name. The continuation of the latest version of the WSSC's MBE program, even as a temporary "Stop-Gap MBE Program," may not comply with constitutional standards, in light of a recent disparity study that compared the agency's utilization of MBE contractors to their availability in the marketplace. Moreover, it is unlikely that the WSSC has authority under State law to implement an MBE program as the Legislature permitted the existing authority to expire, despite being advised that legislation was necessary for the continuation of the program. However, the WSSC may constitutionally undertake outreach efforts to MBEs. In addition, the WSSC may implement other programs that do not award contracts on a race or gender-conscious basis — such as programs designed to increase the participation of small businesses — but that are likely to increase the participation of disadvantaged contractors of all races and genders. Finally, we recommend that the agency continue to collect data about its contracting activities, as such data may be important in any future discussion concerning the existence of discrimination in WSSC contracting.
We recommend that the General Assembly consider legislation authorizing a revival of the WSSC MBE program, appropriately modified in light of the disparity study's conclusion that discrimination had not been eliminated from all areas of WSSC contracting.
 I Constitutional Limitations on MBE Programs
An MBE program that classifies potential government contractors on the basis of race, like other race-conscious affirmative action programs, is subject to strict scrutiny and will be upheld by the courts only if it is narrowly tailored to achieve a compelling government purpose. Adarand Constructors, Inc. v.Pena, 515 U.S. 200 (1995); City of Richmond v. J.A. CrosonCo., 488 U.S. 469 (1989). A government entity's interest in remedying the effects of past or present racial discrimination can justify the use of racial classifications. However, the Supreme Court has held that, for such an interest to be compelling, the entity must be able to identify discrimination in the relevant market in which the entity is a participant.Croson, 488 U.S. at 501-4. Evidence of general societal discrimination not related to the particular market would not be sufficient to justify an MBE program. Id. at 498. In addition, there must be a "strong basis in evidence" of that discrimination at the time the program is established. Id. at 500, 510.
Because a race or gender-conscious program is constitutionally suspect, the Supreme Court has essentially put the burden on a government entity with such a program to justify the program with findings based on evidence. To determine whether there is the requisite evidentiary basis for an MBE program, government entities generally commission a study of the relevant marketplace that includes the availability of minority contractors and their utilization by agencies. A disparity between the percentage of minority-owned businesses in the marketplace and the percentage of government contracts awarded to such enterprises may justify the need for an MBE program to remedy discrimination.[1]
In Croson, the Supreme Court also held that any effort to remedy past discrimination in the particular market must be narrowly tailored to achieve that purpose. 488 U.S. at 507. In that regard, the Court noted that many of the barriers to minority participation in contracting might be eliminated through race-neutral programs related to financing and bonding. Id.;see also Sherbrooke Turf, Inc. v. Minnesota Department ofTransportation, 345 F.3d 964, 972 (8th Cir. 2003), cert.denied, 541 U.S. 1041 (2004) ("Narrow tailoring does not require the exhaustion of every conceivable race-neutral alternative . . . it does require serious good faith consideration of workable race-neutral alternatives"). In addition, the Court indicated that a program that involved rigid numerical quotas would not be narrowly tailored. 488 U.S. at 507-8.
In Croson, the Supreme Court struck down a municipal MBE program that required prime contractors to subcontract at least 30% of the dollar value of any construction contract to MBEs. The Court held that the city had failed to adequately identify and document the discrimination in the local construction industry that it was attempting to remedy. 488 U.S. at 498-506. In addition, the Court found that the plan was not narrowly tailored in that it was over-inclusive — i.e., it provided preferences for groups not represented in the local population and thus for whom there was unlikely to be any evidence of discrimination.Id. at 506.
A program that classifies potential government contractors on the basis of gender is subject to a rigorous, though less demanding, standard than race-based programs. See United Statesv. Virginia, 518 U.S. 515, 531 (1996) (gender-based government action must have an "exceedingly persuasive justification"). While, in theory, the standard of proof required to justify a gender-based affirmative action program is less demanding than that for a race-based program, courts generally have reached the same result for both types of programs when they are supported, or not supported, by the same type of evidence. See, e.g.,Associated Utility Contractors of Maryland, Inc. v. Mayor andCity Council of Baltimore, 83 F.Supp.2d 613 (D.Md. 2000).
Statutes that authorize MBE programs typically contain sunset provisions or other provisions requiring periodic review of the program. This is because the constitutional rationale for the program would disappear if discrimination in the marketplace were eradicated. See Grutter v. Bollinger, 539 U.S. 306, 342 (2003) ("race conscious . . . policies must be limited in time");Associated General Contractors of Ohio, Inc. v. Drabik,214 F.3d 730, 737-38 (6th Cir. 2000), cert. denied,531 U.S. 1148 (2001) (race-based preference program should "not last longer than the discriminatory effects it is designed to eliminate"); Builders Association of Greater Chicago v. City ofChicago, 298 F.Supp.2d 725, 739 (N.D.Ill. 2003) (holding that MBE program without a termination date was not narrowly tailored). In addition, even if discrimination persists, it may be necessary to adjust the program periodically to ensure that it still meets the "narrowly-tailored" standard articulated inCroson.
The requirement that any remedy be narrowly tailored also encourages agencies to employ race and gender-neutral remedies. Such remedies can include a liberalization of bonding, insurance, and experience requirements, assistance with financing, preferences or set asides for small businesses unrelated to the race or gender of the owners. In conjunction with such measures, an agency could track the participation of minority contractors in its contracting in order to assess whether such measures eliminate discrimination. Virdi v. DeKalb School District,
135 Fed. Appx. 262, 268 n. 8 (11th Cir. 2005).
 II WSSC MBE Program
A. Statutory Authorization for WSSC MBE Program
The WSSC was established by the General Assembly to provide water and sewer services in Montgomery and Prince George's counties. Annotated Code of Maryland, Article 29, § 1-101 etseq. To carry out its responsibilities, WSSC enters into contracts for various goods and services, including construction.
Since 1979, the General Assembly has authorized the WSSC to implement an MBE program with respect to construction contracts. Chapter 485, Laws of Maryland 1979; see also Chapter 672, Laws of Maryland 1984, codified as Annotated Code of Maryland, Article 29, §§ 3-102(d), later recodified as § 3-102(f).[2]
Subsequently, during the late 1980's, the WSSC adopted resolutions also establishing MBE programs for other types of contracts which the agency groups into three categories labeled procurement, professional services, and architectural and engineering contracts. Those programs were suspended during the period 1991-92 after the United States District Court held that a provision of the MBE policy that allowed the procurement officer to restrict bidding on a contract to minority contractors lacked statutory authorization and, in any event, would violate theFourteenth Amendment of the United States Constitution because it was not narrowly tailored to remedy the effects of past discrimination. Concrete General, Inc. v. WSSC,779 F.Supp. 370, 377 (D.Md. 1991).[3]
In 1992, the General Assembly enacted additional legislation to authorize the WSSC to implement an MBE utilization program for contracts for goods and services in addition to the construction contracts already covered by § 3-102. Chapter 189, Laws of Maryland 1992, codified at Article 29, § 3-109.[4]
Both enabling statutes included provisions that authorized the WSSC to conduct studies in connection with the MBE program to ensure that it remained consistent with law. Article 29, §§ 31-02(f)(5)(i), 3-109(e)(1). In addition, the WSSC was required to make annual reports to the Montgomery and Prince George's County delegations concerning the implementation and administration of the program. Article 29, §§ 3-102(f)(6), 3-109(f). In 1996, the WSSC consolidated its MBE programs under a single policy statement called "Standard Procedure MBE 96-01."
When it first authorized the WSSC to implement an MBE program for construction contracting in 1979, the Legislature included a sunset provision in the statute — a provision that was later renewed. See Chapter 485, Laws of Maryland 1979; Chapter 672, Laws of Maryland 1984. Since 1992, both statutes authorizing the WSSC's MBE programs have included a sunset provision terminating the program on a specified date in the future. See Chapter 189, Laws of Maryland 1992 (program to terminate on July 1, 1995),codified in Article 29, §§ 3-102(d)(7), 3-109(g). That termination date was extended on several occasions, ultimately to July 1, 2006.[5] In particular, the statutes provided that, after the expiration date, the provisions authorizing the creation and implementation of an MBE program "shall be . . . void and may not be enforced. . . ." Article 29, §§ 3-102(f)(7), 3-109(g).
In 2001, the General Assembly enacted enabling legislation for the WSSC to implement a "local small business enterprise program." Chapter 431, Laws of Maryland 2001, codified at
Article 29, § 3-110. The purpose of the program was to assist small businesses in Montgomery and Prince George's counties by creating procurement preferences for such entities without regard to the race, ethnicity, or gender of the individuals involved in the entity. § 3-110(b), (d). Presumably because this program does not include race or gender-conscious preferences that potentially could become unconstitutional, it has no sunset provision.
B. Standard Procedure 96-01
WSSC Standard Procedure 96-01 was designed to implement the agency's statutory authority to operate an MBE program and generally to encourage the participation of local certified MBEs in WSSC contracting. Standard Procedure 96-01, Parts I-II. The policy defines "minority person" as a person who is "African American, Hispanic, Asian, female, or . . . physically or mentally disabled." Id., Part IV(A). "MBE" is defined as "any legal entity that is organized to engage in commercial transactions, which is at least fifty-one percent (51%) owned and controlled by one or more minority persons" and which has been certified as minority-owned by at least one of several government agencies that certify MBEs. Id., Part IV(B).[6] A "local" MBE is one with a place of business in the WSSC metropolitan area, which is defined to include the District of Columbia, Baltimore City, ten Maryland counties, and several counties and cities in Virginia. Id., Part IV(O).
One of the stated objectives of the policy is to award MBEs at least 20% of construction contracts and contracts for professional services, at least 24% of contracts for architectural and engineering services, and at least 28% of procurement contracts. Id., Parts III, X.[7] Minority contractors who win a prime contract may not subcontract more than 40% of the contract to non-minority subcontractors. Id.,
Part V. Non-minority prime contractors must satisfy mandatory minority subcontracting requirements. Id., Part VI.
The policy lists a variety of ways in which the program will be implemented for each of the four categories of contracts. For example, with respect to the category of "procurement" contracts, such methods include the following:
 encouraging small firms to bid on WSSC contracts through outreach efforts and workshops
 reducing or waiving bonding or insurance requirements for MBEs
 requiring contracts above a threshold level to include an MBE subcontractor utilization clause that mandates the award of a minimum percentage value of subcontracts to MBEs
 waiving corporate experience requirements for MBE firms that apply to other bidders
 awarding contracts to MBEs that bid within a certain percentage of the low bid submitted by a non-minority contractor
 awarding contracts to MBEs that, based on an evaluation by a point system, are ranked within 5% of the point total of the highest ranked non-minority firm
 when evaluating responses to RFPs, aw arding addition al points for participation by MBEs that exceeds the minimum required by the solicitation
 limiting competition for certain contracts to MBEs[8]
 requiring contracts to include a mandatory MBE utilization clause
 with respect to construction contracts, allowing 100% MBE credit for MBE prime contractors that retain at least 60% of the contract
Id., Part XII(C). Because an MBE is defined in part in terms of race, all but one of these techniques would be characterized as a race-conscious technique. Only the effort to increase participation of small businesses could be characterized as race-neutral.
The policy provides for the "graduation" of an MBE to the open market or a temporary "suspension" of an MBE from the program, based on the duration of the firm's participation in the program and its past success in receiving contracts.[9]Id., Part XIV.
The policy also includes various reporting and review requirements. Id., Part XV. In addition, the WSSC reserved the right to waive the policy for specific contracts. Id.,
Part XVI.
C. 2005 Disparity Study
In view of the impending sunset of the statutory authorization for the MBE program in 2005, the WSSC commissioned a disparity study by a private consultant. BBC Research Consulting, WSSC 2005 Disparity Study — Final Report (June 24, 2005) ("Disparity Study"). The Disparity Study focused on the WSSC's contracting activities during the period from 1999, the time of the most recent previous study, through 2004. Disparity Study at I-2. The Disparity Study found that the WSSC utilization of MBEs for goods and services contracts exceeded the percentage availability of such firms in the marketplace. The Disparity Study recommended that the race and gender-conscious parts of the MBE program related to that category of contracts be replaced with a small-business program.
However, the Disparity Study found that WSSC utilization of MBE firms for professional services contracts lagged behind the availability of MBEs for such contracts. The consultant recommended that the agency ensure competitive bidding for such contracts and retain the ability to award preference points to MBEs.
With respect to architectural and engineering contracts, the consultant found that the WSSC had exceeded its goals in the award of subconsultant contracts to MBEs, but that MBEs remained under-utilized with respect to prime contracts. Accordingly, it recommended that the agency encourage MBEs to submit proposals for prime contracts and continue to award extra points to MBE firms when evaluating proposals for prime consultants. It recommended additional flexibility and the eventual phasing out of the subcontracting part of the program with respect to these contracts.
With respect to construction contracts, the Disparity Study found that overall utilization of MBEs as prime contractors was below the availability of those firms to do the work and most of the utilization was concentrated in one MBE firm. It recommended that the agency improve and expand a small business program for construction, increase the bonding threshold, and continue to operate a voluntary goals program at both the prime and subcontractor levels.
D. Expiration of Authorizing Legislation
During the last regular session of the General Assembly, the Legislature considered a further extension of the termination date of the enabling legislation to July 1, 2010, but ultimately failed to pass the bill. See House Bill 1240 (2006); see also
House Bill 1087 (2006) (proposing to revise and extend program). Accordingly, the statutory authority for the MBE program expired as of July 1, 2006.
In anticipation of the expiration of the authorizing legislation, the WSSC General Counsel prepared a detailed memorandum analyzing its impact. Memorandum of Jerome Blask and Vicki E. Webb to Andrew D. Brunhart, General Manager (June 14, 2006). That memorandum concluded that operating such a program without statutory authority would contravene the Legislature's intent in allowing the enabling legislation to expire, that the WSSC must therefore terminate race and gender-conscious policies, that individual commissioners and managers could be subject to personal liability if contracts were awarded based on race-conscious policies that are unambiguously unlawful, and that the WSSC needs to update its data gathering capability to be able to conduct an adequate analysis of the utilization of MBEs in construction subcontracting.
The General Counsel also made recommendations concerning continuation of aspects of the MBE program in each of the WSSC's principal contracting areas. He noted that contract documents would have to be revised to eliminate MBE goals. He concluded that "outreach" programs (i.e., mentoring, matchmaking, contractors' college, etc.), to the extent that they targeted MBEs and therefore were conducted in a race-conscious manner, would have to be curtailed. On the other hand, he expressed the belief that elements of the program targeted at local small businesses in a race-neutral way could be maintained. He also noted that policies that lowered experience, bonding, or insurance requirements for all contractors could facilitate participation by MBE contractors in a race and gender neutral manner. The memorandum concluded that the WSSC would no longer be able to collect data from contractors concerning the extent of their subcontracting with MBEs.
You indicated that the expiration of the authorizing legislation was discussed at a WSSC meeting on June 21, 2006. Apparently, the commissioners discussed the memorandum of the General Counsel summarized above. The commissioners adopted a "Stop Gap MBE Program that is consistent with the current MBE Program" to become effective after July 1, 2006 and to remain in effect while the commissioners asked the Legislature to reenact the enabling legislation. However, on July 26, 2006, the commissioners agreed to suspend the "Stop Gap MBE Program", pending an opinion as to its legality.
 III Analysis
A. Authority of WSSC to Adopt "Stop-Gap MBE Program"
You asked whether the WSSC may implement and enforce the "Stop-Gap MBE Program" that it adopted shortly before the explicit statutory authority for its MBE program expired. As we understand it, the "Stop-Gap MBE Program" would simply be a continuation of the program that existed prior to July 1, 2006 while the agency seeks new authority from the Legislature for its MBE program.
The 2005 Disparity Study indicated that, in some categories of contracting, the percentage of contracts awarded to MBEs exceeded the percentage of MBEs in the relevant market. Accordingly, the Disparity Study recommended that the program be modified or curtailed for those categories. It thus appears that the WSSC would have to make significant changes in its MBE program to preserve the constitutionality of the program under the standards set forth in Croson. Even if the WSSC has authority to adopt a temporary MBE program without explicit authorizing legislation, that program should not simply be a continuation of the current policy outlined in Standard Procedure 96-01.
Thus, in our view, the WSSC may not constitutionally implement and enforce the "Stop-Gap MBE Program", as it is currently envisioned.
B. Authority of WSSC to Adopt MBE Program After Expiration of MBE Statutes
The key question that your inquiry raises is whether the WSSC, once explicitly delegated authority by the General Assembly to devise and implement an MBE program, retains that authority following sunset of that enabling legislation. This is largely a question of State law.[10]
To answer this question we examine three subsidiary questions. First, apart from the MBE enabling legislation itself, when it created the WSSC and conferred various powers on the agency, did the General Assembly grant it sufficient discretion to adopt and implement race and gender-conscious procurement policies to remedy discrimination? Second, does the General Assembly's decision this year to allow the explicit statutory authority for the WSSC MBE program to expire demonstrate that the Legislature intended to forbid the implementation of any MBE program by the WSSC? Third, what steps may the WSSC take to encourage participation of MBEs in its contracting, even if it is not currently permitted to apply race and gender-conscious procurement policies?
1. WSSC Contracting Authority
In Article 29, § 9-101(a), the Legislature has authorized the WSSC to "adopt rules and regulations to carry out the provisions of this article and any other laws the enforcement and administration of which is vested in the WSSC." Any such rules or regulations have the "force and authority of law." Article 29, § 9-101(c). The State courts have not addressed whether such authority would permit an agency like the WSSC to adopt race and gender-conscious contracting policies in the absence of specific authorizing legislation. However, a federal court has held that § 9-101(a) does not confer such authority on the WSSC.
As noted above, the WSSC previously instituted part of its MBE program without specific statutory authorization.[11] The program was challenged on a number of grounds, and the WSSC argued that the part of its program that did not pertain to construction contracts was within its authority under § 9-101(a).See Concrete General, Inc. v. WSSC, 779 F.Supp. 370 (D.Md. 1991). The federal district court concluded that the WSSC lacked authority under that statute to create a minority preference program. Id. at 374. The court construed § 9-101(a) to confer all powers necessary for the WSSC to carry out the duties assigned to it by the Legislature. It thus framed the question before it as whether the power to create an MBE program was a power "necessary" to carry out the WSSC's legislative mandate.Id. at 375. The court then answered that question in the negative: "The Court does not see how denying to WSSC the implied power to create an [MBE program] impairs WSSC's ability to carry out its legislatively imposed function." Id. The court also stated that it had found no evidence that the General Assembly intended to charge the WSSC with responsibility for "structuring its contracts so as to rectify any perceived inequality." Id.
at 376. The court feared that implying the power to create an MBE program into the WSSC statute would similarly empower every administrative agency in an area that it characterized as "constitutionally suspect." Id. Finally, the court observed that the General Assembly had enacted specific legislation when it created an MBE program as part of the State procurement law and when it created an MBE program for WSSC construction contracting. Id. at 376-77.
The Concrete General case was decided by a federal court. Thus, its conclusions concerning a matter of State law, such as the authority of the WSSC to create an MBE program based on the its general authority to enter into contracts and enforce and administer the laws, is not as definitive as a decision by the Court of Appeals of Maryland. Even after Concrete General was decided in 1991, there were substantial arguments that the WSSC indeed had authority under State law to create an MBE program, at least to remedy its own discrimination, even in the absence of explicit authorizing legislation.[12] See Letter of Assistant Attorney General Kathryn M. Rowe to Delegate Michael Arrington (August 19, 1991). However, Maryland courts may view the decision by the federal district court as persuasive authority as to whether Maryland law currently permits the agency to adopt a race and gender-conscious remedy, particularly in light of developments subsequent to Concrete General. Most pertinent are the General Assembly's decision to enact specific MBE legislation and its subsequent failure to renew that legislation.
2. Failure to Renew Explicit MBE Program Authorization
As noted above, the statutory authorization for the WSSC MBE program has been renewed for several years at a time at various intervals since 1992. When the most recent three-year extension was about to expire in 2005, the General Assembly renewed the authorization for another year until July 1, 2006 and did not renew it thereafter, despite proposed legislation to do so. What is the significance of the expiration of the specific statutory authority to operate an MBE program, which had existed for more than 25 years with respect to construction contracts and 14 years for other types of procurement?
Canons of Statutory Construction
The courts have sometimes drawn different conclusions from a legislature's failure to enact proposed legislation. On the one hand, the Court of Appeals has reiterated on a number of occasions that the failure of a bill in the Legislature is "a weak reed on which to lean." See, e.g., Harden v. Mass TransitAdministration, 277 Md. 399, 406, 354 A.2d 817 (1976) (failure of General Assembly to pass bills explicitly excluding MTA from "no-fault" statute concerning automobile insurance could simply mean that Legislature believed that it was already clear that MTA was not included). On the other hand, the Court has sometimes "recognized that the rejection of proposed legislation has some relevance in respect to ascertaining the intent of the Legislature." Comptroller v. Clyde's of Chevy Chase, Inc.,377 Md. 471, 502, 833 A.2d 1014 (2003) (failure of General Assembly to amend admissions and amusement tax to include provision similar to federal statute on which it was modeled demonstrated that Legislature intended that State statute should be construed differently).
In the abstract, these brief expressions of statutory construction appear to be contradictory. However, in the context of the opinions that employ them, they simply summarize the conclusion drawn from an examination of the legislative record —i.e., whether or not the Legislature's failure to act in a particular instance sheds any true light on the underlying legislative purpose. The legislative history of the particular law will generally demonstrate which of the seemingly opposing canons of construction more aptly characterizes the legislative inaction. In this respect, what, if anything, the Legislature likely understood to be the consequences of failing to enact a proposed bill or amendment is key. This requires an examination of the legislative record of the bills that proposed to extend the WSSC MBE Program.
Legislative History of MBE Program Extension Legislation
The legislative files for the 2005 and 2006 bills concerning the WSSC MBE program, while not extensive, suggest that the General Assembly understood that the WSSC program would be halted if it did not extend the expiration date for the authorizing legislation.
During the 2005 session, a bill was introduced to extend the expiration date of the WSSC MBE legislation for five years. House Bill 606 (2005), in its original form, would have extended the sunset date to July 1, 2010. The WSSC submitted testimony in support of the bill and advised the Legislature that "[w]ithout legislation the [MBE program] will sunset July 1, 2005 and WSSC will have no legal authority to continue its programmatic effort to aid and assist minority vendors . . ." WSSC Position Statement on House Bill 606 (November 16, 2004). At the request of the Prince George's County Senate delegation, the bill was amended to shorten the extension to one year. This was apparently done to allow for completion of the 2005 Disparity Study to ensure that the program complied with constitutional standards. See Bill Review Letter of Attorney General J. Joseph Curran, Jr. (May 2, 2005).
During the 2006 session, a bill was again submitted to extend the sunset date to July 1, 2010. House Bill 1240 (2006). It received the support of both the Montgomery County and Prince George's County House delegations, as well as county officials. Again, the WSSC submitted testimony that the bill was essential to the continuation of its MBE program. While the bill passed the House, it failed to get out of committee in the Senate. As a result, the enabling legislation for the WSSC MBE program expired on July 1, 2006.
The inclusion of an expiration date for the law suggests that the General Assembly contemplated that the program would terminate, unless it chose to extend or modify the program in the future. The sunset provisions directed that the laws authorizing the MBE program "shall be . . . void and may not be enforced after July 1, 2006." §§ 3-102(f)(7), 3-109(g). An effort to create an MBE program along the same lines as that authorized by those statutes would appear to be an attempt to "enforce" that statute contrary to the direction of the General Assembly.
As explained above, in order to meet constitutional standards under Croson, an MBE program must be "narrowly tailored." One element of that requirement is that the program have a limited duration subject to review. A legislative decision to allow an MBE program to expire could be consistent with the constitutional mandate that a race and gender-conscious program last no longer than necessary to cure the evil to which it is addressed. One might infer that the General Assembly determined that an MBE program was no longer necessary at WSSC because discrimination in the agency's contracting had been eliminated or other measures were satisfactory to deal with its remnants.
Such an inference would be at odds with the 2005 Disparity Study which characterized some categories of WSSC contracting as "on the road to success", but not yet successful, in achieving the goals of the MBE program. Moreover, it is notable that, during the same session that it allowed the WSSC MBE program to lapse, the General Assembly extended the life of the MBE program in the State procurement law for five years to 2011 with a report due in September 2010. Chapter 359, Laws of Maryland 2006.
Summary
The Legislature was advised, without contradiction, that the proposed bills were essential to the continuation of the WSSC MBE program past July 1, 2006. That assertion fit within the framework of prior legislative action, ever since the ConcreteGeneral decision. Thus, it appears a fair inference that the Legislature understood, and intended, that its inaction would result in at least a temporary discontinuance of race and gender-conscious contracting practices at the WSSC. We recommend that the Legislature revisit this issue in light of the 2005 Disparity Study, which concluded that, although the agency had made substantial progress in the utilization of MBEs, it could not document the elimination of discrimination.
3. Permissible Actions in the Absence of an MBE Statute
Finally, we address what steps the WSSC may take to encourage participation by MBEs in its contracting without adopting a race and gender-conscious policies such as the "Stop-Gap MBE Program."
Article 29, § 3-102, requires that the WSSC follow a competitive bidding process for the award of contracts for the design and construction of water supply or sanitary sewer systems. § 31-02(c)-(e). An MBE "outreach" program is not necessarily inconsistent with a competitive bidding requirement.Compare Domar Electric, Inc. v. City of Los Angeles,885 P.2d 934, 940-42 (Cal.S.Ct. 1994) (MBE outreach program not inconsistent with competitive bidding requirement in city charter, as the competitive bidding requirement necessarily implied equal opportunity and enforcement of the program could lead to lower prices) with Associated General Contractors ofCalifornia, Inc. v. City and County of San Francisco,813 F.2d 922 (9th Cir. 1987) (ordinance that mandated set asides and bidding preferences for MBEs violated municipal charter requiring competitive bidding). In our view, there is no prohibition against the agency's promoting the participation of minority and women contractors in its contracting activities, so long as it does not confer a preference on such contractors.
We understand that the WSSC MBE program imposes various reporting requirements on contractors, although those requirements are not specifically described in Standard Procedure 96-01. The WSSC's General Counsel has advised the agency to modify those reporting requirements. We agree that the expiration of the authorizing legislation for the WSSC's MBE Program does not prohibit it from collecting data about its contracting activities. Such data may be important in any further study conducted to determine whether the program should be resurrected.
Finally, there are a variety of mechanisms that the WSSC may employ to expand opportunities for small businesses that do not involve classifications by race or gender. In addition to establishing contracting preferences for local small businesses as authorized by § 3-110,[13] the agency may also attempt to eliminate hurdles that may inhibit such businesses from competing for WSSC contracts, such as bonding, insurance, and other requirements.
 IV Conclusion
In our opinion, in the absence of statutory authority, the WSSC MBE program should not be continued, even under a new temporary name. The continuation of the latest version of the WSSC's MBE program, even as a temporary "Stop-Gap MBE Program," may not comply with constitutional standards, in light of a recent study that compared the agency's utilization of MBE contractors to their availability in the marketplace. Moreover, it is unlikely that the WSSC has authority under State law to implement an MBE program as the Legislature permitted the existing authority to expire, despite being advised that legislation was necessary for the continuation of the program. However, the WSSC may constitutionally undertake outreach efforts to MBEs. In addition, the WSSC may implement other programs that do not award contracts on a race or gender-conscious basis — such as programs designed to increase the participation of small businesses — but that are likely to increase the participation of disadvantaged contractors of all races and genders. Finally, we recommend that the agency continue to collect data about its contracting activities, as such data may be important in any future discussion concerning the existence of discrimination in WSSC contracting.
We recommend that the General Assembly consider legislation authorizing a revival of the WSSC MBE program, appropriately modified in light of the 2005 Disparity Study.
 J. Joseph Curran, Jr. Attorney General
 Robert N. McDonald Chief Counsel Opinions and Advice
[1] See Croson, 488 U.S. at 509 (plurality opinion of Justice O'Connor) ("Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise").
[2] Unless otherwise indicated, the citations to Article 29, § 3-102 and § 3-109 are to the versions of those statutes as they existed prior to the expiration § 3-102(f) and § 3-109 on July 1, 2006.
[3] The Concrete General decision was based in large part on the Supreme Court's decision in City of Richmond v. J.A.CrosonCo., 488 U.S. 469 (1989). See Part III.B.1, below, for further discussion of Concrete General.
[4] Implementation of the program was premised on findings by the WSSC that MBEs were under represented in the award of such contracts and that an MBE utilization program would be necessary to remedy effects of past discrimination in contracting by the WSSC. Article 29, § 3-109(b).
[5] Chapter 257, Laws of Maryland 1995 (extension to July 1, 1997); Chapter 491, Laws of Maryland 1997 (extension to July 1, 1999); Chapter 256, Laws of Maryland 1999 (extension to July 1, 2002); Chapter 387, Laws of Maryland 2002 (extension to July 1, 2005); Chapter 562, Laws of Maryland 2005 (extension to July 1, 2006).
[6] The policy echoes in many respects the definition of "MBE" in the statute authorizing the State MBE program. See Annotated Code of Maryland, State Procurement Article, § 14-301 et seq.
Unlike the definition of "socially and economically disadvantaged individual" in the State MBE program, the WSSC policy does not include Native Americans within its definition of "minority person." The State MBE program was cross-referenced in the statute authorizing the WSSC programs. See
Article 29, §§ 3-102(f)(1), 3-109(c)(1).
[7] If the WSSC should rely on Standard Procedure 96-01 in the future, it may wish to review these percentage goals in light of the disparity study.
[8] The policy states that this procedure may not be used unless "all less restrictive remedies and race neutral remedies . . . have been used and found to be ineffective." Part XII (A)(6), (C)(8), (D)(1)(e).
[9] Generally, an MBE "graduates" from the program five years after the date of award of its first contract, although it may obtain a two-year extension if it has not been awarded at least three contracts or $50,000 in work during those five years. With respect to construction contracts, a firm's participation may not be counted toward the MBE requirement if it has had at least five contracts and been awarded $7 million in WSSC work; also, once an MBE has been awarded $3 million in WSSC work for a particular year, the firm's participation no longer counts toward an MBE requirement for the remainder of that fiscal year.
[10] The plurality opinion in Croson briefly acknowledged that a local government's authority to adopt an MBE program depended on State law:
 It would seem equally clear, however, that a state or local subdivision (if delegated the authority from the State) has the authority to eradicate the effects of private discrimination within its own legislative jurisdiction. . . .
 [a]s a matter of state law, the city of Richmond has legislative authority over its procurement policies, and can use its spending powers to remedy private discrimination, if it identifies that discrimination with the particularity required by the Fourteenth Amendment. . . . Thus, if the city could show that it had essentially become a "passive participant" in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system.
488 U.S. at 491-92.
[11] At the time, the MBE program for construction contracts was specifically authorized by Article 29, § 3-102.
[12] The WSSC enabling law provides that the "[t]he WSSC may not discriminate against a person on the basis of sex, race, creed, color, age, mental or physical handicap, sexual orientation, or national origin." Article 29, § 1-107.
[13] It should be noted that, because many states, including Maryland (see SFP § 14-401), have a reciprocal preference law, a preference for local resident firms may hinder their ability to obtain contracts in neighboring states. *Page 201